IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JAMES ALLAN FITCH, | ) | CASE NO.  3:22-CV-01806-JRK |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | JUDGE  JAMES R. KNEPP, II |
| vs. | ) | UNITED STATES DISTRICT JUDGE |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | MAGISTRATE JUDGE |
| SECURITY, | ) | JONATHAN D. GREENBERG |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |

Plaintiff, James Allan Fitch ("Plaintiff" or "Fitch"), challenges the final decision of Defendant, Kilolo Kijakazi,[1] Acting Commissioner of Social Security ("Commissioner"), denying his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act,[2] 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be VACATED AND REMANDED for further proceedings consistent with this opinion.

## I.  PROCEDURAL HISTORY

In May 2020, Fitch filed an application for SSI, alleging a disability onset date of December 1, 2013 and claiming he was disabled due to: learning disability; numbness in left hand and penis; coldness

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

[2] While Fitch filed for a period of disability and Disability Insurance Benefits under Title II as well (Transcript ("Tr.") 15), he amended his alleged onset date at the hearing, which post-dated his Date Last Insured and thus terminated is Title II claim.  (*Id.* at 39-40.)  However, the ALJ considered the Title II claim in the decision.  (*Id.* at 15-28.)

1

and numbness in arm; social anxiety; back spasms; chest spasms; left leg spasms; swollen left knee; lump on bottom of left foot; tachycardia; sleep issues; migraines; neck issues from car accident; and herniated discs.  (Transcript ("Tr.") 15, 64, 86.)  The application was denied initially and upon reconsideration, and Fitch requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 15.)

On July 6, 2021, an ALJ held a hearing, during which Fitch, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On August 25, 2021, the ALJ issued a written decision finding Fitch was not disabled.  (*Id.* at 15-28.)  The ALJ's decision became final on August 16, 2022, when the Appeals Council declined further review.  (*Id.* at 1-6.)

On October 7, 2022, Fitch filed his Complaint to challenge the Commissioner's final decision. (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 7-9.)  Fitch asserts the following assignment of error:

> (1) The ALJ's RFC determination is the product of legal error and therefore not supported by substantial evidence because the ALJ failed to properly evaluate and reconcile the opinions of Dr. Ashton and CMS [sic] Palmer pursuant to the regulations.

(Doc. No. 7.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Fitch was born in August 1968 and was 52 years-old at the time of his administrative hearing (Tr. 15, 26), making him a "person closely approaching advanced age" under Social Security regulations.  *See* 20 C.F.R. § 416.963(d).  He has at least a high school education.  (Tr. 26.)  He has past relevant work as an injection mold machine tender and driver.  (*Id*. at 56.)

2

**B.     Medical Evidence[3]**

On May 27, 2020, Fitch saw Philip Ashton, M.D., to establish care.  (Tr. 378.)  Dr. Ashton noted Fitch was starting the disability process.  (*Id.*)  Fitch complained of muscle spasms, sore joints, lumbago with some burning, chronic low back pain, and "minimal pressure to numerous areas of the shoulders, back, and hips."  (*Id.* at 378-79.)  Fitch reported it took very little for his muscles to spasm.  (*Id.* at 379.)  His lumbar muscles would "tie up easily with recurrent lifting."  (*Id.*)  Temperature extremes caused pain and fatigue.  (*Id.*)  When he experienced muscle tightness, Fitch got anxiety to the point of panic.  (*Id.*)  He had a hard time standing in the shower, temperature extremes of the water caused a lot of pain, and he struggled with many aspects of daily living.  (*Id.*)  Fitch worried about money as he felt he was unable to go back to the heavy labor jobs he had been doing before taking care of a sick relative for the past six years.  (*Id.* at 378.)  He experienced chest pressure when walking short distances.  (*Id.* at 379.)  He smoked a half a pack of cigarettes a day.  (*Id.*)  While most of Fitch's major issues were physical, he also endorsed severe anxiety and agoraphobia.  (*Id.*)  Fitch reported tearfulness over minor events and depression.  (*Id.*)  He avoided crowds, although he did have friends.  (*Id.*)

On examination, Dr. Ashton found a PHQ-9 score of 24, which indicated severe depression.  (*Id.* at 378.)  Dr. Ashton further found strength loss that seemed to be associated with muscle spasm after minimal activity, no focal weakness, and bilateral foot-ankle clonus.  (*Id.* at 379-80.)  Fitch's diagnoses included muscle spasm, acute right-sided low back pain, fatigue, major depressive disorder, single episode, unspecified, anxiety disorder, unspecified, Raynaud's disease, tobacco dependence, insomnia, and chest pain.  (*Id.* at 380.)  Dr. Ashton prescribed Flexeril and Lexapro.  (*Id.*)

On June 10, 2020, Fitch saw Dr. Ashton for follow up.  (*Id.* at 376.)  Fitch reported no benefit from Lexapro.  (*Id.*)  While Flexeril helped with his muscle spasms, it did not help him sleep and made him

---

[3] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

groggy throughout part of the day.  (*Id.*)  Fitch told Dr. Ashton he had gone for a few walks, but it made his legs and back burn after a short period of time.  (*Id.*)  Fitch denied any improvement in his sleep.  (*Id.*) On examination, Dr. Ashton found "[m]ultiple areas of excessively sensitive muscles especially the lumbar, shoulder and thigh groups," no tremor, no obvious sensory loss, and no motor deficit.  (*Id.* at 377.) Dr. Ashton diagnosed Fitch with fibromyalgia and cyclothymic disorder and started Fitch on Cymbalta. (*Id.*)

On July 1, 2020, Fitch saw Dr. Ashton for follow up.  (*Id.* at 374.)  Fitch reported Cymbalta was helping him sleep more, and he denied any side effects.  (*Id.*)  Fitch told Dr. Ashton he continued to have anxiety, and Dr. Ashton noted Fitch had only been on Cymbalta for a week.  (*Id.*)  Fitch complained of lots of muscle spasms, although he had been riding his bike a little, and he feared being out.  (*Id.*)  He wanted to go back to work.  (*Id.*)  On examination, Dr. Ashton found full range of motion of upper and lower extremities, "a lot of" continued point tenderness over the paravertebral groups of thoracic and lumbar areas," no tremor, no obvious sensory loss, and no motor deficit.  (*Id.* at 375.)  Dr. Ashton started Fitch on Xanax.  (*Id.*)

On July 23, 2020, Fitch saw Dr. Ashton for follow up.  (*Id.* at 371.)  Fitch reported his new antidepressant was making him tired but was helping a little, although Dr. Ashton noted he had only been on it for a week and a half.  (*Id.*)  Fitch complained of low back pain and chest pain that was sharp on occasion and radiated to his left arm.  (*Id.*)  Fitch told Dr. Ashton he had begun an office cleaning job and was having problems with back spasms while he worked.  (*Id.*)  Fitch reported he felt hung over if he took both Xanax and Cymbalta at night.  (*Id.*)  Fitch felt he had better nerve control with Cymbalta, but he had only been on it for 10 days.  (*Id.*)  Fitch's chest pain occurred with activity and resolved with rest, and associated symptoms included shortness of breath and nausea.  (*Id.*)  On examination, Dr. Ashton found "slight" chest wall tenderness with pressure over the ribs, although not to the level of what Fitch claimed

4

his discomfort to be, no tremor, no obvious sensory loss, and no motor deficit.  (*Id.* at 372.)  Dr. Ashton started Fitch on Tizanidine for back spasm.  (*Id.*)

On August 20, 2020, Fitch saw Dr. Ashton for follow up of his August 3, 2020 stress test and EKG.  (*Id.* at 368.)  Fitch reported trying to adjust to his medications.  (*Id.*)  While he still had a very hard time getting up in the morning, Fitch thought it was a little better.  (*Id.*)  Fitch felt he did well on his stress test, although he was sore for four days afterwards.  (*Id.*)  Fitch reported most quick movements caused muscle spasm and his ability to reach or lift overhead was very limited.  (*Id.*)  Fitch complained of continued low back pain with sciatica, left greater than right, and tingling of the legs to the foot on the left and to the knee on the right with straight leg raises.  (*Id.*)  Dr. Ashton noted Fitch's stress test was normal.  (*Id.*)  On examination, Dr. Ashton found decreased rotation and lateral and forward flexion of the lumbar spine, multiple areas of tenderness across the bilateral trapezius, paravertebral, and gluteal areas, increased sciatica with straight leg raises bilaterally, flat Achilles reflexes bilaterally, no tremor, no obvious sensory loss, and no motor deficit.  (*Id.* at 369.)  Dr. Ashton diagnosed Fitch with cervical arthritis, arthritis of the lumbar spine, and fibromyalgia, and ordered MRIs of the lumbar and cervical spine.  (*Id.*)

MRIs of the lumbar and cervical spine taken on August 31, 2020 revealed mild chronic degenerative disc changes at in the neck and low back but no major findings that would explain Fitch's pain and muscle spasms.  (*Id.*)

An MRI of the cervical spine taken on September 8, 2020 revealed "[m]ild chronic degenerative disc changes at several levels in the cervical spine as described above but no significant compromise of the canal, foramina, or cord at any level."  (*Id.* at 443.)  An MRI of the lumbar spine taken the same day revealed "[m]ild chronic multilevel degenerative disc changes but no significant compromise of the canal, foramina, or cord at any level."  (*Id.* at 445.)

On September 16, 2020, Fitch saw Dr. Ashton for follow up.  (*Id.* at 363.)  Fitch reported getting used to his medications and was worried about increasing them.  (*Id.*)  Fitch told Dr. Ashton his muscle spasms were improved but still prohibitive.  (*Id.*)  Even going from a shower to outside the bathroom after drying off can be enough of a temperature change to cause his muscles to spasm.  (*Id.*)  Fitch reported being uncomfortable around men and had far fewer male friends than female friends.  (*Id.*)  Fitch told Dr. Ashton he was fine around men he had been friends with for a long time.  (*Id.*)  On examination, Dr. Ashton found pain with abduction in forward or anatomical positive of the bilateral upper extremities, especially above 110 degrees of flexion, resistiveness of the lumbar paravertebral groups with bilateral shoulder forward positions, tenderness and spasm of the trapezii, cervical strap muscles, and the lumbar paravertebral groups, no tremor, no obvious sensory loss, and no motor deficit.  (*Id.* at 364.)  Fitch's diagnoses included social anxiety disorder and fibromyalgia.  (*Id.*)

On September 25, 2020, with the help of his attorney, Fitch completed an adult function report.  (*Id.* at 297-304.)  Fitch reported he could not stand for long, and he had a hard time turning from side to side and picking things up.  (*Id.* at 297.)  He could not kneel or bend down, and he could not walk or stand for long.  (*Id.*)  Fitch further reported having a hard time being around others, especially men, and found paperwork and deadlines overwhelming.  (*Id.*)  He did not handle stress well and shut down when he was stressed.  (*Id.*)  Fitch struggled to focus and calm his thoughts and had social anxiety.  (*Id.*)  Stress caused him to get migraines that made it hard to focus.  (*Id.*)  Fitch spent his days sitting and watching television.  (*Id.* at 298.)  He had sleep problems, which affected when he woke up.  (*Id.*)  Fitch was very stiff when he woke up.  (*Id.*)  He could care for himself, although he had to dress slowly and carefully, and the bathroom needed to be very warm when he bathed so he did not get muscle spasms.  (*Id.*)  He prepared simple food for himself since he could not stand for long.  (*Id.* at 299.)  He mopped and swept and cleaned the bathroom weekly, but he used a long stick to clean the bathtub so he did not have to bend.  (*Id.*)  Fitch

6

went to gas stations, work, and Walmart once a month.  (*Id.* at 301.)  He could shop in stores, but it only took a few minutes.  (*Id.* at 300.)  He could sit for fifteen minutes.  (*Id.* at 302.)  He could walk for ten to fifteen minutes before needing to rest for five minutes.  (*Id.*)  He had short-term memory problems and could not focus for more than a few minutes because his mind raced and he got distracted.  (*Id.*)  He could follow verbal instructions, but he had a hard time following written instructions.  (*Id.*)  He did not handle stress or changes in routine well.  (*Id.* at 303.)

On November 18, 2020, Fitch saw Dr. Ashton for follow up.  (*Id.* at 398.)  Fitch reported popping his low back two months ago but that it was feeling better.  (*Id.*)  Fitch also told Dr. Ashton he had popped his left shoulder while mopping.  (*Id.*)  He struggled getting out in and out of bed.  (*Id.*)  Fitch reported that the muscle relaxers helped, but he did have a dull pain that day.  (*Id.*)  He told Dr. Ashton he had a hard time moving his left arm.  (*Id.*)  Fitch mopped with his left shoulder forward, as mopping with his right shoulder forward caused pain in the low thoracic and high lumbar area and right sided paravertebral muscle spasm.  (*Id.*)  He reported feeling much better taking Cymbalta, Xanax, and Tizanidine and tolerated people a little bit better.  (*Id.*)  Fitch endorsed a "fair amount" of PTSD symptoms including flashbacks, panic attacks, and night terrors, and he avoided public places most of the time.  (*Id.*)  On examination, Dr. Ashton found forward rotation of the right shoulder brought on more spasm than the same movement with the left shoulder forward and was limited in excursion due to pain.  (*Id.* at 399.)  Neutral rotation in a sitting position brought on spasms of the right paravertebral muscles.  (*Id.*)  The left side paravertebral muscles also had a slight spasm from the low thoracic to the high lumbar area.  (*Id.*)  Dr. Ashton further found a lipoma over the right low lumbar area over the paravertebral group that caused pain when Fitch lied on it, as well as a negative straight leg raise test bilaterally.  (*Id.*)  Dr. Ashton continued to find no tremor, no obvious sensory loss, and no motor deficit.  (*Id.*)  Fitch's diagnoses included sprain of the ligaments of the lumbar spine, strain of the left biceps, benign lipomatous neoplasm,

and paresthesia.  (*Id.*)  Dr. Ashton administered a corticosteroid injection into Fitch's left bicep and prescribed Klonopin.  (*Id.*)

On December 16, 2020, Fitch saw Dr. Ashton for follow up.  (*Id.* at 395.)  Fitch reported continued shoulder pain and good days and bad days with his neck pain, although his neck pain was improving.  (*Id.*) Fitch complained of right shoulder soreness and pain and told Dr. Ashton the steroid injection in his left shoulder had not helped much.  (*Id.*)  Fitch also endorsed left knee pain when kneeling or pivoting on the left foot and soreness for days afterward.  (*Id.*)  On examination, Dr. Ashton found tenderness of the left acromion process, no tenderness over the left short bicep tendon, pain with abduction and point tenderness of the left acromion process, normal motion and extension of the right and left knees, positive patellar grind on the left, no ligament laxity, no tremor, no obvious sensory loss, and no motor deficit.  (*Id.*) Fitch's diagnoses included acute pain of the left shoulder and chondromalacia.  (*Id.*)

X-rays of the left shoulder taken that same day showed moderate degenerative arthritis of the AC joint.  (*Id.* at 439.)

From December 8, 2020 through February 12, 2021, Fitch saw Kathryn Palmer, CNS, for mental health treatment.  (*Id.* at 401-12.)

From February 26, 2021 through April 30, 2021, Fitch saw Michelle Laver, LISW, for counseling. (*Id.* at 427-31.)

On May 3, 2021, Fitch saw Dr. Ashton for follow up.  (*Id.* at 424.)  Fitch reported continued pain that had just been left-sided but now was bilateral.  (*Id.*)  He described bilateral numbness and tingling in his hands and pain in between his fingers.  (*Id.*)  Fitch also complained of continued upper and lower back pain that radiated into his shoulders, as well as difficulty with movement as abduction caused pain around the coracoid process, with the left worse than right.  (*Id.*)  Fitch reported numbness in his hands when using vibrating instruments, such as a vacuum, at work.  (*Id.*)  Vacuuming also caused back pain and he

needed to rest for up to 15 minutes in a two-hour timeframe.  (*Id.*)  Fitch endorsed poor sleep, and that he could not take the current dose of trazodone as it knocked him out and he was afraid of incontinence.  (*Id.*)  Fitch also complained of pain down his right and left buttocks, left worse than right, that went all the way into his calf, especially with straight leg raise on the left, and associated symptoms included a burning sensation across the posterior lumbar aspect of the back.  (*Id.*)  He told Dr. Ashton he had a hard time raising himself with his legs and did not think he could do it on just one leg.  (*Id.*)  Dr. Ashton noted the right leg seemed to be "much worse" from a strength perspective.  (*Id.*)

On examination, Dr. Ashton found positive Tinel's sign on the right, pseudo-positive Tinel's sign on the left, weak abduction of the shoulders bilaterally, left worse than right, positive straight leg raise test bilaterally, left more than right, flat Achilles reflexes bilaterally, positive patellar grind sign bilaterally, left more than right, no tremor, no obvious sensory loss, and no motor deficit.  (*Id.* at 425.)  Fitch's diagnoses included social anxiety disorder, fibromyalgia, carpal tunnel syndrome on the right, and lumbago with sciatica on the left.  (*Id.*)  Dr. Ashton directed Fitch to stop Tizanidine and start Norflex. (*Id.*)  Dr. Ashton noted: "We may need to get x-rays and/or an MRI in the future involving cervical and the lumbar spine.  Fear that there is radiculopathy of the bilateral shoulder.  Have decided that we may have to look into surgical options.  Await progress with Norflex."  (*Id.*)

That same day, Dr. Ashton completed a Physical Assessment.  (*Id.* at 414-15.)  Fitch's diagnoses included chronic back pain with left sciatica, anxiety, depression, social anxiety, ADHD, and cervical arthritis with bilateral shoulder pain and weakness.  (*Id.* at 414.)  Dr. Ashton opined Fitch would frequently have symptoms associated with his impairments that would interfere with the attention and concentration to perform simple work-related tasks.  (*Id.*)  Fitch would need to lie down or recline during an eight-hour workday.  (*Id.*)  Fitch could walk less than one block, sit up to three hours total in an eight-hour workday, and stand or walk up to one hour in an eight-hour workday.  (*Id.*)  Fitch would need to take

9

at least one unscheduled break every two hours for 15 minutes. (*Id.*) Fitch could occasionally lift less than ten pounds, ten pounds, and twenty pounds. (*Id.*) Fitch could never lift more than twenty pounds. (*Id.*) Fitch could use his hands up to 20% of the workday and use his arms for reaching up to 10 % of the workday. (*Id.*) Fitch would be absent from work three or four times per month. (*Id.* at 415.)

Dr. Ashton also completed a mental capacity assessment form. (*Id.* at 418-20.)

On May 20, 2021, CNS Palmer completed a mental impairment questionnaire and an onset date questionnaire. (*Id.* at 466-69.)

## C. State Agency Reports

### 1. Mental Impairments

On December 21, 2020, Cindy Matyi, Ph.D., reviewed the file and determined there was insufficient evidence to substantiate the presence of a mental disorder. (*Id.* at 67.)

On March 11, 2021, on reconsideration, Dr. Jennifer Swain opined Fitch had a mild limitation in his ability to understand, remember, or apply information and moderate limitations in his abilities to interact with others, concentrate, persist, or maintain pace, and adapt or manage himself. (*Id.* at 88-89.) Dr. Swain opined that the mental RFC from the prior administrative decision appeared reasonable and supported based on the updated information. (*Id.* at 93.)

### 2. Physical Impairments

On October 25, 2020, W. Scott Bolz, M.D., reviewed the file and determined Fitch could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for about six hours in an eight-hour workday, and sit for a total of about six hours in an eight-hour workday. (*Id.* at 69-70.) His ability to push and/or pull was unlimited, other than shown for lift and/or carry. (*Id.* at 69.) He could occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds. (*Id.*) His

ability to balance was unlimited.  (*Id.*)  He could frequently stoop, kneel, crouch, and crawl.  (*Id.*)  He must avoid concentrated exposure to hazards.  (*Id.* at 70.)

On March 16, 2021, on reconsideration, Diane Manos, M.D., affirmed Dr. Bolz' findings, except Dr. Manos opined Fitch must avoid all exposure to hazards.  (*Id.* at 90-91.)

**D.   Hearing Testimony**

During the July 6, 2021 hearing, Fitch testified to the following:

- He lives alone in a one-level apartment.  (*Id.* at 41.)  Climbing stairs hurts his legs, back, and knees.  (*Id.*)  He has a cane, so he does not have to get down to get things from the bottom of his refrigerator.  (*Id.*)  He cannot get down on the floor.  (*Id.*)

- He works as a cleaner for a dialysis clinic.  (*Id.*)  He was "kind of forced into doing that so [he] wouldn't be homeless."  (*Id.*)  He works for about two hours, but it takes him three to three and a half hours because he takes a lot of breaks.  (*Id.* at 44.)  He could not work that job full time because he "can barely do the two hours [he's] doing now."  (*Id.* at 54.)  His knees and arms hurt badly, and when he comes home, he feels like a truck ran him over.  (*Id.*)

- He has problems with reading and spelling, has a learning disability, and was in special education classes.  (*Id.* at 42.)  He can pay in cash at a store, although it takes him a few minutes.  (*Id.* at 43.)  He has a checking account, but it is simple since it just has a debit card.  (*Id.*)  He can "sort of" read and understand cartoons in the newspaper, but not articles with big words.  (*Id.* at 54.)  He is lost with anything beyond a four-letter word.  (*Id.*)

- He does not have a valid driver's license.  (*Id.* at 43.)  His license was taken away a few years ago, and once he was eligible to get an Ohio license, he was too scared to go down and deal with all the people that he didn't know.  (*Id.*)  His neighbor takes him to the store and back and forth to work.  (*Id.*)

- He cannot work because his back hurts if he tries to do anything.  (*Id.* at 47.)  His knees hurt if he is on his feet for too long.  (*Id.*)  His foot goes numb.  (*Id.*)  He cannot raise his left arm too high.  (*Id.*)  He cannot hold onto things for long with his left hand.  (*Id.*)  His neck tenses up and it hurts all the way down.  (*Id.*)  He cannot bend over and pick things up because it hurts badly and starts to burn.  (*Id.*)  He gets bad muscle spasms, so he even needs to watch himself in the shower.  (*Id.* at 48.)  If he turns too fast, he will get a muscle spasm that goes from his back to his chest and won't go away.  (*Id.*)

- He doesn't like being out in public.  (*Id.*)  He doesn't like dealing with men.  (*Id.*)  He freaks out and gets physically sick.  (*Id.*)  He gets tense and gets headaches and has to stop.  (*Id.*)

11

- He is seeing a therapist and taking medication, but they are still in the process of adjusting medication.  (*Id.*)  Sometimes the sleeping pills help and sometimes they don't.  (*Id.*)  When they do work, he feels like he hasn't slept, and he is in slow motion for several hours after waking up.  (*Id.*)  He feels like things are getting worse.  (*Id.*)  He has nightmares and is afraid to go to sleep at night.  (*Id.*)  After three days, he ends up "crashing in the chair for a few hours," and then everything is stiff.  (*Id.* at 49.)  It takes him a while to walk around and get everything flowing again.  (*Id.*)  He has had some side effects from his medication.  (*Id.*)

- His mental health impairments cause him to get spots in his eyes and his heart to race, so he has to sit down.  (*Id.*)  He feels like he is going to pass out.  (*Id.*)  He needs to get away from that place and be by himself.  (*Id.*)  The only places he feels safe are his apartment and his car.  (*Id.*)  He is okay one on one with women if he knows them.  (*Id.* at 49-50.)  He does not like groups of people.  (*Id.* at 50.)

- He can walk for 10-15 minutes before he has to sit down if he is trying to push it.  (*Id.*)  Everything hurts.  (*Id.*)  He does not cook much anymore; his meals consist of TV dinners and pizza and things like that.  (*Id.*)  It hurts too much to stand there and prepare everything, so he doesn't make big meals.  (*Id.*)  His neighbor takes him grocery shopping.  (*Id.*)  He knows what he is going to get, and he gets it.  (*Id.*)  He cannot be in there long.  (*Id.*)

- He has no family.  (*Id.*)  He does not belong to any groups or organizations.  (*Id.* at 50-51.)  He does not have any hobbies.  (*Id.* at 51.)  He does not have any pets.  (*Id.*)  He has a Facebook account, but he doesn't know how to operate it.  (*Id.*)  A friend of his set it up for him so they could stay in touch.  (*Id.*)  He knows how to like stuff and how to comment.  (*Id.*)  He uses talk to text to comment and search Google.  (*Id.*)  He does not play video or computer games.  (*Id.*)

- He could not do a job where he had to sit and sort or fold things because his arm would start to hurt.  (*Id.* at 52.)  He cannot put his arm up and move things around like that.  (*Id.*)  He cannot sit for long.  (*Id.*)

- He cannot reach overhead.  (*Id.* at 53.)  His arms will go numb if he tries to do so.  (*Id.*)  With his left shoulder, he can only reach out so far before he gets a sharp pain.  (*Id.*)  He can bring his left elbow level with his shoulder and that's it.  (*Id.*)

The VE testified Fitch had past work as an injection mold machine tender and a driver.  (*Id.* at 56.)

The ALJ then posed the following hypothetical question:

> Please assume a hypothetical individual of the claimant's age, education, and relevant vocational background.  We're going to begin at the light exertional level.  He can do light work except he can occasionally climb ramps and stairs.  He can never climb ladders, ropes, or scaffolds.  He can frequently stoop, bending at the waist, kneel, crouch bending at the knees, and crawl.  He is to avoid all of --
> .  .  .  He is to avoid all exposure to unprotected heights and dangerous heavy

machinery.  He can do occasional overhead reaching.  He is limited to occasional foot controls.  He is able to do simple tasks in a setting without demands for fast pace or strict production quotas.  He is to have occasional contact with supervisors, coworkers, and is to have no contact with the general public.  He is limited to few changes in the routine work setting that are easily explained.  He is limited to jobs without written instructions, and that only require occasional reading.  Can the hypothetical individual I have just described perform any of the past work as actually performed, or generally performed in the national economy?

(*Id.* at 56-57.)

The VE testified the hypothetical individual would be able to perform Fitch's past work as an injection mold machine tender.  (*Id.* at 58.)  The VE further testified the hypothetical individual would also be able to perform other representative jobs in the economy, such as marker, garment sorter, and bench assembler.  (*Id.*)

### III.    STANDARD FOR DISABILITY

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. § 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. § 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. § 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is

presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. § 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. § 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. § 416.920(g).

## IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through June 30, 2014.

2.  The claimant has not engaged in substantial gainful activity since December 1, 2013, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.  The claimant has the following severe impairments: Mild chronic multilevel degenerative disc disease of the spine; Arthritis in the cervical and lumbar spine; Social anxiety disorder; post-traumatic stress disorder (PTSD); and obesity (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except He can occasionally climb ramps and stairs; He can never climb ladders ropes or scaffolds; He can frequently stoop (bending at the waist), kneel, crouch (bending at the knees), and crawl.  He is to avoid all exposure to unprotected heights and dangerous heavy machinery.  He can do occasional overhead reaching.  He is limited to occasional foot controls.  He is able to do simple tasks in a setting without demands for fast pace or strict production quotas.  He is to have occasional contact with supervisors, coworkers and is to have no contact with the general public.  He is limited to few changes in the routine work setting that are easily explained.  He is limited to jobs without written instructions and that only require occasional reading.

6.  The claimant is capable of performing past relevant work as an *Injection Mold Machine Tender*, DOT code 556.685-038, SVP 2, light exertion per the DOT and

as performed by the claimant.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.  The claimant has not been under a disability, as defined in the Social Security Act, from December 1, 2013, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 17-27.)

## V.  STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law

Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

In his sole assignment of error, Fitch argues that the ALJ "failed to provide legally sufficient explanations for rejecting the opinions" of Dr. Ashton and CNS Palmer.  (Doc. No. 7 at 12.)  While Fitch acknowledges the ALJ provided some explanation for rejecting these opinions, Fitch asserts the ALJ

16

mischaracterized the evidence and therefore "did not properly discuss the supportability and consistency factors." (*Id.* at 13-14.) Fitch argues the ALJ failed to discuss other findings supportive of disability in discussing Dr. Ashton's opinion regarding Fitch's physical impairments, and certain objective findings were not discussed in the opinion at all. (*Id.* at 14.) Fitch also points out that while the ALJ mentions Fitch's lungs being clear, that had nothing to do with any of the impairments at issue. (*Id.*)

The Commissioner responds that a plain reading of the ALJ's decision makes clear that the ALJ properly evaluated the opinions of Dr. Ashton and CNS Palmer. (Doc. No. 8 at 1.) The Commissioner asserts the ALJ discussed the supportability and consistency factors, identified the deficiencies in the opinions, and discussed the evidence of record. (*Id.*) Therefore, the Commissioner maintains that substantial evidence supports the ALJ's RFC finding. (*Id.*)

In reply, Fitch argues that the Commissioner's argument is nothing more than impermissible *post-hoc* rationalization. (Doc. No. 9 at 1.)

Since Fitch's claim was filed after March 27, 2017, the Social Security Administration's new regulations ("Revised Regulations") for evaluation of medical opinion evidence apply to this claim. *See Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules)*, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 416.920c.

Under the Revised Regulations, the Commissioner will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." 20 C.F.R. § 416.920c(a). Rather, the Commissioner shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the factors set forth in the regulations: (1) supportability;[4] (2) consistency;[5] (3) relationship with the claimant,

---

[4] The Revised Regulations explain the "supportability" factor as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her

including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements.  20 C.F.R. § 416.920c(a), (c)(1)-(5).  However, supportability and consistency are the most important factors.  20 C.F.R. § 416.920c(b)(2).

The Revised Regulations also changed the articulation required by ALJs in their consideration of medical opinions.  The new articulation requirements are as follows:

> (1) Source-level articulation. Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.
>
> (2) Most important factors. The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(1).
[5] The Revised Regulations explain the "consistency" factor as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(2).

(3) Equally persuasive medical opinions or prior administrative medical findings about the same issue. When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision.

20 C.F.R. § 416.920c(b)(1)-(3).

"Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'" *Ryan L.F. v. Comm'r of Soc. Sec.,* No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019) (quoting 20 C.F.R. § 416.920c(a), (b)(1)).   A reviewing court "evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Id.*

In the RFC analysis, in rejecting Dr. Ashton's opinion as unpersuasive, the ALJ found as follows:

The opinion of Philip Ashton is found to be less persuasive as it is internally inconsistent and is not otherwise supported by the record (8F). More specifically, the doctor opined that the claimant' [sic] symptoms would frequently interfere with his ability to maintain attention and concentration and that he would require the ability to lie down during the day (Id.). He opined the claimant can sit for up to three hours in and eight-hour workday and can stand/walk for only one hour in and eight-hour workday (Id.). He further opined that the claimant would require an additional fifteen-minute break every hour and that the claimant is only capable of walking up to one block (Id.). The doctor opined that the claimant can lift up to twenty pounds occasionally and that the claimant can use his upper extremities for grasping and fine manipulation for up to twenty percent of the workday. However, he also opined that the claimant was only able to use his bilateral upper extremities to reach for up to ten percent of the workday (Id.). Finally, the doctor opined that the claimant will be absent from work up to four times per month (Id.).  Imaging reveals on minor degenerative disc disease and the claimant retains a normal range of motion in his neck and his lungs were clear Examination of his extremities revealed no edema, cyanosis, clubbing, atrophy, or decreased range of motion (1F:18). No focal weakness was observed and only a mild decrease in generalized strength was noted (Id.). For the above reasons, the opinion of Dr. Ashton is found to be unpersuasive. Consistent with the record as a

19

> whole, the residual functional capacity above limits the claimant to performing work at the light exertional level with occasional climbing of ramps and stairs and no climbing of ladders ropes or scaffolds. He can frequently stoop (bending at the waist), kneel, crouch (bending at the knees), and crawl. He is to avoid all exposure to unprotected heights and dangerous heavy machinery. He can do occasional overhead reaching. He is limited to occasional foot controls.

(Tr. 23-24.)

The undersigned finds the ALJ erred in his evaluation of Dr. Ashton's opinion regarding Fitch's physical impairments. First, it is unclear without explanation from the ALJ how the functional limitations identified above in Dr. Ashton's opinion are internally inconsistent. (*Id.* at 23.) Furthermore, the ALJ's statement that there was no decreased range of motion of Fitch's extremities on examination is incorrect. For example, in September 2020, Dr. Ashton found pain with abduction in forward or anatomical positive of the bilateral upper extremities, especially above 110 degrees of flexion, and resistiveness of the lumbar paravertebral groups with bilateral shoulder forward positions. (*Id.* at 364.) In November 2020, Dr. Ashton found limited shoulder rotation due to pain. (*Id.* at 399.) In May 2021, Dr. Ashton found weak shoulder abduction bilaterally. (*Id.* at 425.) Furthermore, the ALJ recited positive examination findings supportive of disability from Dr. Ashton's treatment notes, including multiple areas of "excessively sensitive muscles," spasms in his shoulders with forward rotation, positive Tinel's sign on the right and pseudo-positive Tinel's sign on the left, and positive straight leg raise testing, but failed to explain how those findings factored into his analysis of Dr. Ashton's opinion. (*Id.* at 22-24) *See Simmons v. Saul,* No. 1:19-CV-00745, 2020 WL 60193, at *12 (N.D. Ohio Jan 6., 2020) ("An explanation of the ALJ's analysis is especially important where, as here, the ALJ seems to deny the existence of the very evidence he recited only paragraphs before by saying the opinion 'is not supported by the record.'")

In addition, the ALJ also fails to discuss several other findings supportive of disability from Dr. Ashton's treatment notes. For example, in August 2020, Dr. Ashton found decreased rotation and lateral and forward flexion of the lumbar spine and increased sciatica with straight leg raises bilaterally. (*Id.* at

369.)  In December 2020, Dr. Ashton found tenderness of the left acromion process, pain with abduction and point tenderness of the left acromion process, and positive patellar grind of the left knee.  (*Id.* at 396.)  In May 2021, Dr. Ashton found flat Achilles reflexes bilaterally and positive patellar grind sign bilaterally, left more than right.  (*Id.* at 425.)

It is well established that the ALJ may not ignore or overlook contrary lines of evidence.  *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")).  It is possible that proper consideration of these findings may have also impacted the ALJ's analysis of Dr. Ashton's opinion.

As the undersigned recommends this matter be remanded on this ground, in the interest of judicial economy, the Court declines to reach the additional arguments set forth in Fitch's sole assignment of error.

## VII.   CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be VACATED AND REMANDED for further proceedings consistent with this opinion.

Date: May 15, 2023                                    _s/ Jonathan Greenberg_
                                                      Jonathan D. Greenberg
                                                      United States Magistrate Judge

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).**